IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN  DISTRICT OF NORTH CAROLINA

CA No.:

| | | |
|---|---|---|
| STEVEN FREEMAN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| FRYE REGIONAL MEDICAL CENTER, | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## PARTIES

1. Plaintiff Steven Freeman Jr. is a resident of Catawba County, North Carolina.

2. Defendant Frye Regional Medical Center, Inc. is a Corporate Entity formed under the laws of State Of North Carolina with a principal place of business is in 14201 Dallas Parkway, Dallas, Texas 75254 and Registered Office at 160 Mine Lake Ct., Suite 200, Raleigh, NC 27615-6417 and conducts business in North Carolina, including operating facilities in Hickory, North Carolina.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 USCS § 1331, as this action arises under 42 USCS § 2000e-2 and.

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USCS § 1367, as those claims form part of the same case or controversy as Plaintiff's federal claims.

5. This Court has personal jurisdiction over Frye Regional Medical Center, Inc. because Defendant is a resident of North Carolina with its operating facilities and Registered Office at 160 Mine Lake Ct., Suite 200, Raleigh, NC 27615-6417.

6. Venue is proper in this Court pursuant to 28 USCS § 1391, as Defendant resides in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

## STATEMENT OF FACTS

7. Plaintiff Steven Freeman Jr. was employed by Defendant Frye Regional Medical Center as an anesthesia technician from July 10, 2023, through December 19, 2025.

8. Plaintiff earned an hourly wage of $17.66.

9. Plaintiff's direct supervisors were Kaitlyn Keller-Hinson and Charlene Jolly.

10. Plaintiff is an African American male.

11. In June 2024, Plaintiff received unprovoked racist, derogatory, and threatening messages from Roger Bowman, the spouse of Plaintiff's supervisor Charlene Jolly.

12. Plaintiff had never had any contact with Roger Bowman prior to receiving these messages.

13. The messages contained explicit racial slurs, including repeated use of the word "nigger," and death threats.

14. The messages stated, among other things, "I will come and put a fucking bullet in your fucking nigger head" and "I will have you both fired from hosp I'm not fucking playin games anymore."

15. The messages referenced Plaintiff's residence and family members, stating "I know where you live I know all about you nigger."

16. The messages included graphic violent imagery, stating "I have hogs that need fed bad and they love dark meat."

17. On the day following receipt of these messages in June 2024, Plaintiff reported the threatening messages to OR manager Batanya.

18. Batanya expressed that she was very upset about the messages.

19. Despite Batanya's reaction, no action was taken by Defendant to address the harassment or death threats.

20. The harassment and death threats were not escalated to the OR director or other hospital leadership.

21. On July 3, 2024, Plaintiff visited his primary care physician, who added propranolol to Plaintiff's medications for elevated blood pressure and anxiety caused by the threatening situation.

22. Threatening messages continued through November and December 2024, transmitted through supervisor Charlene Jolly's phone.

23. Plaintiff felt extremely unsafe every time he walked into the hospital because he did not know if he would make it back home due to the threats against his life.

24. In January 2025, Plaintiff obtained a no-contact order against Roger Bowman.

25. The no-contact order was active through January 2026.

26. Plaintiff took the no-contact order to Defendant's HR manager, Tim Hasson.

27. Tim Hasson was required by hospital policy to send the no-contact order and photographs of Roger Bowman to hospital security.

28. Within two weeks of Plaintiff's meeting with Tim Hasson, Plaintiff's primary care physician increased Plaintiff's lamotrigine, a mood stabilizer, for uncontrolled depression.

29. Plaintiff's primary care physician also increased Plaintiff's propranolol dosage for blood pressure and anxiety.

30. Three weeks after Plaintiff's meeting with Tim Hasson, Plaintiff checked with hospital security about the no-contact order and Roger Bowman's photographs.

31. Security stated they had never received the no-contact order or photographs.

32. Security stated they would reach out to Tim Hasson for the information.

33. On August 6, 2025, supervisor Charlene Jolly privately informed Plaintiff that Roger Bowman had scheduled an MRI procedure under anesthesia at the hospital for August 8, 2025.

34. The no-contact order was still active at this time.

35. Charlene Jolly told Plaintiff in private that he could take the day off by saying he did not have a babysitter, or that he could clock out while Roger Bowman was present and then come back in.

36. Charlene Jolly's suggestion would have required Plaintiff to forgo pay from his job so that Roger Bowman could have a procedure at the hospital.

37. An alternative surgery center at Frye Imaging at a different location was able to perform the exact same procedure.

38. On August 6, 2025, Plaintiff went to security to again ask if they had received the no-contact order information.

39. Security confirmed they had not received any information.

40. Plaintiff obtained a written statement from two security guards on shift confirming that there was no information about Roger Bowman or photographs in the hospital to alert staff about his dangerous threats.

41. Hospital policy required security to be alerted when any staff member is threatened by a patient or outside source.

42. Plaintiff immediately began having panic attacks upon learning that Roger Bowman would be at the hospital.

43. On August 8, 2025, Plaintiff was required to work due to the number of procedures scheduled.

44. A Certified Registered Nurse Anesthetist (CRNA) provided a written and signed statement that Plaintiff was highly needed for the scheduled procedures.

45. While working on August 8, 2025, Roger Bowman and Charlene Jolly passed Plaintiff in the hallway.

46. Plaintiff was already experiencing anxiety issues at work.

47. The encounter with Roger Bowman in the hallway caused Plaintiff's anxiety to accelerate because Roger Bowman had stated in his messages that he would come to the hospital and blow Plaintiff's brains out.

48. After Roger Bowman and Charlene Jolly left the hospital, Plaintiff filed an incident report for safety and security about the situation.

49. The incident report caused Tim Hasson, Director of HR, to request a meeting with Plaintiff.

50. Plaintiff told Tim Hasson that he did not feel comfortable talking to him alone because at the last meeting, Tim Hasson had dismissed what he was required to do for hospital safety.

51. Over the phone, Tim Hasson aggressively refused Plaintiff's request to have someone Plaintiff trusted and was comfortable with present at the meeting.

52. Tim Hasson's aggressive refusal was recorded.

53. Because Tim Hasson and HR did not take Plaintiff's safety concerns or the no-contact order seriously, Plaintiff's supervisor's spouse, who had threatened Plaintiff's life, was able to schedule a procedure at Plaintiff's job and in Plaintiff's department.

54. Plaintiff filed for a violation of the no-contact order.

55. The violation order was not granted because Plaintiff was not aware he needed to attach all of the threatening messages with the violation paperwork.

56. Plaintiff was required to appear in court regarding the no-contact order violation.

57. At the court hearing, Plaintiff saw his supervisor Charlene Jolly with Roger Bowman, the man who had threatened to kill Plaintiff.

58. Charlene Jolly and Roger Bowman testified against Plaintiff in court.

59. Seeing his supervisor at court with the man who threatened to kill him testify against him sent Plaintiff's mental state over the edge.

60. Plaintiff's primary care physician wrote Plaintiff out of work following the court appearance.

61. On September 4, 2025, Plaintiff had a virtual appointment with his primary care physician, who wrote Plaintiff out of work for two weeks.

62. On September 18, 2025, Plaintiff had an updated appointment with his primary care physician, who extended Plaintiff out of work due to his unstable and depressed mental state.

63. On September 16, 2025, a man threatened staff in the emergency room at Defendant's hospital.

64. Defendant immediately posted flyers throughout the hospital on September 16, 2025, alerting staff about the threat.

65. Plaintiff was aware that Defendant alerted security and the rest of the hospital about the person who threatened staff in the emergency room.

66. Defendant had not provided similar alerts to security or staff about Roger Bowman's threats against Plaintiff.

67. On October 3, 2025, Plaintiff's primary care physician extended Plaintiff out of work until November 5, 2025.

68. On November 5, 2025, Plaintiff's primary care physician prescribed Buspirone, an anxiety medication to be taken multiple times a day.

69. On November 5, 2025, Plaintiff's primary care physician wrote Plaintiff out of work until the end of the year, December 31, 2025.

70. Plaintiff was so depressed with poor mental stability that he was barely able to leave his house from August 2025 through the end of the year.

71. Plaintiff's depression was compounded by learning that Defendant had alerted security and the rest of the hospital about someone who threatened staff in the emergency room but had not done the same for Plaintiff.

72. Due to meeting the limit of short-term disability coverage, Plaintiff was required to attempt to return to work on December 8, 2025.

73. Plaintiff's primary care physician, Amanda Kincaid, quickly sent in a request for Plaintiff to reduce his hours to part-time, twenty hours per week.

74. The reduction to part-time hours was ordered because when Plaintiff returned, Charlene Jolly was still an employee and was still the supervisor to whom Plaintiff had to report.

75. Plaintiff lost multiple paychecks due to not being able to return to work from his consistent panic attacks and depression.

76. The loss of income multiplied Plaintiff's depression because he could not pay bills or provide for himself or his family.

77. Plaintiff returned to work after his short-term disability on December 8, 2025, working part-time as ordered by his primary care physician.

78. Plaintiff worked on December 8, 10, 11, and 15, 2025.

79. Because Charlene Jolly was still present and still Plaintiff's supervisor, the work environment became very uncomfortable and almost hostile.

80. Plaintiff's panic attacks amplified upon his return to work.

81. Defendant made no work accommodations besides the reduction to part-time hours.

82. Defendant did not offer Plaintiff a department change.

83. Defendant did not remove Charlene Jolly as Plaintiff's supervisor or otherwise ensure that Plaintiff did not have to work with Charlene Jolly.

84. Plaintiff resigned on December 19, 2025, because returning to work worsened his mental state.

85. Plaintiff still suffers from severe, almost unbearable depression from having to quit his job due to Defendant not caring about his safety or taking any action to ensure that he was safe and did not have to worry about losing his life five days a week at work.

86. On January 9, 2026, Plaintiff had an appointment with the Equal Employment Opportunity Commission (EEOC) regarding his case of discrimination.

87. On January 20, 2026, the EEOC closed Plaintiff's case and issued Plaintiff a Right to Sue letter.

88. The EEOC charge number is 430-2025-04295.

89. Plaintiff has all documentation of every event, including letters, emails, doctor visits, and recordings.

90. Witnesses to the events include Emily Pritchett, Steven Freeman Sr., and Amanda Kincaid.

**Count I - Race Discrimination in Violation of 42 USCS § 2000e-2**

(against defendant Frye Regional Medical Center)

91. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 90 as if fully set forth herein.

92. Plaintiff is a member of a protected class based on his race.

93. Plaintiff is an African American male.

94. Plaintiff was qualified to perform his job as an anesthesia technician.

95. Plaintiff was employed by Defendant from July 10, 2023, through December 19, 2025, and performed his duties satisfactorily.

96. A CRNA provided a written statement on August 8, 2025, that Plaintiff was highly needed for scheduled procedures.

97. Plaintiff suffered an adverse employment action.

98. Plaintiff was constructively discharged on December 19, 2025, when he was forced to resign due to intolerable working conditions.

99. The adverse employment action occurred under circumstances giving rise to an inference of discrimination based on race.

100. Plaintiff received unprovoked racist messages containing explicit racial slurs and death threats from his supervisor's spouse.

101. Plaintiff reported the racist threats to Defendant's management in June 2024 and January 2025.

102. Despite having actual knowledge of the racist threats and death threats, Defendant took no action to protect Plaintiff or address the harassment.

103. Defendant failed to enforce the no-contact order that Plaintiff obtained against his harasser.

104. Defendant failed to alert security about the threats against Plaintiff, despite hospital policy requiring such alerts.

105. Defendant allowed Plaintiff's harasser to schedule a procedure at the hospital despite the active no-contact order.

106. Defendant forced Plaintiff to work in the same department where his harasser was present.

107. Defendant suggested that Plaintiff take unpaid time off to avoid his harasser rather than taking action to protect Plaintiff.

108. Defendant provided alerts to security and staff when a different individual threatened staff in the emergency room but did not provide similar alerts regarding the threats against Plaintiff.

109. Defendant's differential treatment of Plaintiff compared to other threatened employees demonstrates that the adverse action occurred under circumstances giving rise to an inference of race discrimination.

110. Defendant treated similarly situated non–African American employees more favorably under comparable circumstances. Upon information and belief, when non–African American employees reported threats or safety concerns, Defendant responded promptly and took visible protective measures. For example, when a visitor threatened an employee in the emergency room, Defendant distributed flyers containing the individual's photograph and warnings throughout the hospital within approximately one day. Similarly, when concerns arose regarding a sales representative's conduct in the operating room, Defendant posted notices the same week restricting that individual's access. In contrast, despite Plaintiff's repeated reports of explicit racial slurs and death threats, Defendant failed to issue any comparable alerts, post warnings, notify staff, or implement meaningful protective measures. Instead, Defendant required Plaintiff to continue working in proximity to the source of the threats and suggested that Plaintiff take unpaid leave to avoid the danger. This disparate treatment of Plaintiff, an African American employee, compared to similarly situated non–African American employees who received prompt and effective protection, gives rise to an inference of unlawful race discrimination.

111. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered damages including lost wages, medical expenses, severe emotional distress, and other compensatory damages.

**Count II - Hostile Work Environment Based on Race in Violation of 42 USCS § 2000e-2**

(against defendant Frye Regional Medical Center)

112. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 111 as if fully set forth herein.

113. Plaintiff is a member of a protected class based on his race.

114. Plaintiff is an African American male.

115. Plaintiff was subjected to unwelcome harassment.

116. In June 2024, Plaintiff received unprovoked messages containing explicit racial slurs, death threats, and violent imagery.

117. The messages repeatedly used the racial slur "nigger" and referenced Plaintiff's race with phrases such as "dark meat."

118. The messages threatened to kill Plaintiff, stating "I will come and put a fucking bullet in your fucking nigger head."

119. The messages continued through November and December 2024.

120. The harassment was based on Plaintiff's race.

121. The messages explicitly referenced Plaintiff's race through the use of racial slurs and race-based derogatory language.

122. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

123. The racist death threats caused Plaintiff to fear for his life every time he entered the hospital.

124. Plaintiff began experiencing elevated blood pressure and anxiety requiring medication in July 2024.

125. Plaintiff's mental health deteriorated progressively, requiring increases in psychiatric medications and ultimately extended medical leave.

126. Plaintiff suffered panic attacks, depression, and anxiety so severe that he could barely leave his house.

127. The harassment ultimately forced Plaintiff to resign from his employment.

128. Defendant knew of the harassment and failed to take prompt and appropriate corrective action.

129. Plaintiff reported the racist threats to OR manager Batanya in June 2024.

130. Plaintiff reported the racist threats and provided the no-contact order to HR manager Tim Hasson in January 2025.

131. Despite having actual knowledge of the harassment, Defendant took no action to stop the harassment or protect Plaintiff.

132. Defendant failed to enforce the no-contact order.

133. Defendant failed to alert security about the threats.

134. Defendant allowed Plaintiff's harasser to come to the hospital despite the active no-contact order.

135. Defendant forced Plaintiff to encounter his harasser in the workplace.

136. Defendant's failure to take prompt and appropriate corrective action allowed the hostile work environment to continue and worsen.

137. Plaintiff repeatedly sought assistance from management, including requesting protective measures and guidance on how to safely perform his job, but was provided only inadequate and impractical responses, such as being instructed to call the front desk to seek permission for the harasser's presence or to use internal messaging systems that Plaintiff reasonably believed could expose him to further threats. When Plaintiff raised concerns with Human Resources, he was met with dismissive responses, including being asked, "what do you expect from this," rather than being provided meaningful protection.

138. As a direct and proximate result of Defendant's failure to address the hostile work environment, Plaintiff has suffered damages including lost wages, medical expenses, severe emotional distress, and other compensatory damages.

### Count III - Retaliation in Violation of 42 USCS § 2000e-3

(against defendant Frye Regional Medical Center)

139. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 138 as if fully set forth herein.

140. Plaintiff engaged in protected activity.

141. Plaintiff reported racist harassment and death threats to OR manager Batanya in June 2024.

142. Plaintiff reported racist harassment and death threats to HR manager Tim Hasson in January 2025.

143. Plaintiff filed an incident report regarding safety and security concerns in August 2025.

144. Reporting racial harassment and discrimination constitutes protected activity under Title VII.

145. Defendant knew of Plaintiff's protected activity.

146. Defendant's managers, including Batanya and Tim Hasson, received Plaintiff's reports of racist harassment.

147. Defendant's HR department was aware of Plaintiff's incident report and safety concerns.

148. Plaintiff suffered adverse employment actions.

149. After Plaintiff reported the harassment, Defendant failed to take any corrective action to protect Plaintiff.

150. After Plaintiff provided the no-contact order to HR manager Tim Hasson, Defendant failed to enforce the order or alert security.

151. After Plaintiff filed an incident report in August 2025, HR manager Tim Hasson aggressively refused Plaintiff's request to have a support person present at a meeting.

152. Defendant allowed Plaintiff's harasser to schedule a procedure at the hospital despite Plaintiff's reports and the active no-contact order.

153. Defendant forced Plaintiff to work in the same department as his harasser.

154. Defendant failed to provide meaningful accommodations to address Plaintiff's safety concerns.

155. Defendant's actions created intolerable working conditions that forced Plaintiff to resign.

156. There was a causal connection between Plaintiff's protected activity and the adverse employment actions.

157. The adverse actions occurred after Plaintiff engaged in protected activity.

158. The temporal proximity between Plaintiff's reports and Defendant's failure to take corrective action establishes a causal connection.

159. Defendant's aggressive response to Plaintiff's incident report and request for a support person demonstrates retaliatory animus.

160. Defendant's differential treatment of Plaintiff compared to other employees who reported threats demonstrates retaliatory intent.

161. When Plaintiff raised ongoing safety concerns and requested assistance, HR manager Tim Hasson responded in a dismissive manner, stating, "what do you expect from this," reflecting disregard for Plaintiff's complaints. In addition, following Plaintiff's safety report in August 2025, HR manager Tim Hasson refused Plaintiff's reasonable request to have a support person present during a meeting and instead spoke to Plaintiff in an aggressive manner over the phone, repeatedly challenging Plaintiff by stating, "Wanna get into it over the phone?" and "We can get into it right now," which was recorded. Defendant further failed to implement any meaningful safety measures despite being aware of comparable threats against other employees, including situations in which the hospital rapidly circulated warnings and posted flyers when other individuals posed safety threats, demonstrating a pattern of more favorable treatment toward employees who did not engage in protected activity. Taken together, these facts support an inference that Defendant's adverse actions and refusal to implement safety measures were motivated by retaliatory animus toward Plaintiff's repeated complaints of racial harassment and safety concerns.

162. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages including lost wages, medical expenses, severe emotional distress, and other compensatory damages.

### Count IV - Constructive Discharge in Violation of 42 USCS § 2000e-2

163. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 162 as if fully set forth herein.

164. Plaintiff resigned from his employment on December 19, 2025.

165. The working conditions were so intolerable that a reasonable person in Plaintiff's position would feel compelled to resign.

166. Plaintiff's supervisor, Charlene Jolly, whose spouse had sent racist death threats to Plaintiff, remained in her supervisory position over Plaintiff.

167. Defendant had allowed the individual who threatened Plaintiff's life to schedule a procedure at the hospital despite the active no-contact order.

168. Defendant had failed to enforce the no-contact order or alert security to the threat against Plaintiff.

169. Defendant had forced Plaintiff to encounter his harasser in the workplace.

170. Plaintiff suffered severe panic attacks and anxiety upon returning to work in December 2025.

171. Defendant offered no meaningful accommodations beyond a reduction to part-time hours.

172. Defendant did not offer Plaintiff a department transfer or change of supervisor.

173. Plaintiff's mental health had deteriorated to the point where he could barely leave his house.

174. Plaintiff was taking multiple psychiatric medications for depression and anxiety caused by the work situation.

175. A reasonable person in Plaintiff's position, facing racist death threats, forced to work under the supervisor whose spouse made the threats, and receiving no protection from the employer, would feel compelled to resign.

176. The intolerable conditions were based on Plaintiff's race and were in retaliation for Plaintiff's protected activity.

177. The harassment that created the intolerable conditions was explicitly racist, involving repeated racial slurs and race-based threats.

178. Defendant's failure to address the harassment and protect Plaintiff occurred after Plaintiff engaged in protected activity by reporting the harassment.

179. Plaintiff did not delay unreasonably in resigning.

180. Plaintiff resigned on December 19, 2025, after working only four days following his return from medical leave.

181. Plaintiff's brief attempt to return to work demonstrated that the working conditions remained intolerable.

182. Plaintiff resigned immediately upon confirming that Defendant would not provide meaningful accommodations or protection.

183. Defendant failed to enforce the no-contact order, failed to notify security in a timely manner, and failed to implement any meaningful protective measures. Instead, Plaintiff was instructed to rely on inadequate and unsafe alternatives, including contacting the front desk during emergencies or using internal communication systems that Plaintiff reasonably believed could expose him to further risk. Plaintiff's treating physician contemporaneously documented worsening anxiety, panic attacks, depression, and

hypertension requiring multiple medication adjustments, as well as repeated work restrictions and periods of medical leave caused by the ongoing workplace conditions. Even after returning from leave on a reduced schedule, Plaintiff experienced immediate and severe deterioration in his mental health upon being required to continue working under the same supervisory structure and without adequate protection, confirming that Defendant had not remedied the hostile and unsafe environment.

184. As a direct and proximate result of Defendant's actions that created intolerable working conditions and forced Plaintiff's constructive discharge, Plaintiff has suffered damages including lost wages, medical expenses, severe emotional distress, and other compensatory damages.

## Count V - Race Discrimination in Violation of 42 USCS § 1981

(against defendant Frye Regional Medical Center)

185. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 184 as if fully set forth herein.

186. Plaintiff is a member of a protected class based on his race.

187. Plaintiff is an African American male.

188. Defendant intentionally discriminated against Plaintiff based on his race.

189. Plaintiff received unprovoked racist messages containing explicit racial slurs and death threats.

190. Plaintiff reported the racist threats to Defendant's management.

191. Despite having actual knowledge of the racist threats, Defendant took no action to protect Plaintiff or address the harassment.

192. Defendant failed to enforce the no-contact order that Plaintiff obtained against his harasser.

193. Defendant allowed Plaintiff's harasser to come to the hospital despite the active no-contact order.

194. Defendant forced Plaintiff to work in the same department where his harasser was present.

195. Defendant suggested that Plaintiff take unpaid time off to avoid his harasser rather than taking action to protect Plaintiff.

196. Defendant provided alerts to security and staff when a different individual threatened staff but did not provide similar alerts regarding the threats against Plaintiff.

197. Defendant's deliberate indifference to the racist threats and differential treatment of Plaintiff demonstrates intentional discrimination based on race.

198. The discrimination concerned Plaintiff's employment contract with Defendant.

199. Plaintiff's employment relationship with Defendant constitutes a contract protected by Section 1981.

200. Defendant's discriminatory conduct affected the making and enforcement of Plaintiff's employment contract.

201. Defendant's actions forced Plaintiff to resign, thereby terminating his employment contract.

202. Defendant's discriminatory intent is shown by its inconsistent treatment of safety threats: it quickly issued hospital-wide alerts and posted flyers when other individuals threatened staff but failed to take comparable action in response to Plaintiff's repeated reports of explicit race-based death threats. Instead, Defendant allowed Plaintiff's harasser

continued access to the hospital, including scheduling a procedure in Plaintiff's department, and suggested Plaintiff take unpaid leave to avoid the danger.

203. As a direct and proximate result of Defendant's intentional race discrimination, Plaintiff has suffered damages including lost wages, medical expenses, severe emotional distress, and other compensatory damages.

### Count VI - Failure to Accommodate Disability in Violation of 42 USCS § 12112

(against defendant Frye Regional Medical Center)

204. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 203 as if fully set forth herein.

205. Plaintiff has a disability within the meaning of the Americans with Disabilities Act (ADA).

206. Plaintiff suffers from depression, anxiety, and panic attacks.

207. These mental health conditions substantially limit Plaintiff's major life activities, including working and leaving his house.

208. Plaintiff's primary care physician documented Plaintiff's mental health conditions and prescribed multiple psychiatric medications, including propranolol, lamotrigine, and buspirone.

209. Plaintiff required extended medical leave from September through December 2025 due to his mental health conditions.

210. Plaintiff was qualified to perform the essential functions of his job as an anesthesia technician with or without reasonable accommodations.

211. A CRNA provided a written statement that Plaintiff was highly needed for scheduled procedures.

212. Plaintiff worked successfully as an anesthesia technician from July 2023 through August 2025 before his medical leave.

213. Defendant knew of Plaintiff's disability.

214. Plaintiff took medical leave from September through December 2025 for mental health reasons.

215. Plaintiff's primary care physician submitted requests and orders for accommodations, including reduced work hours.

216. Defendant was aware that Plaintiff's mental health conditions were caused by the work situation and the threats against him.

217. Plaintiff requested accommodations and Defendant should have known that accommodations were needed.

218. Plaintiff's primary care physician ordered a reduction to part-time hours (twenty hours per week) as an accommodation.

219. Plaintiff requested the right to have a support person present at a meeting with HR, which was refused.

220. Plaintiff's need for accommodations was evident from his extended medical leave and medical documentation.

221. Defendant failed to provide reasonable accommodations.

222. While Defendant reduced Plaintiff's hours to part-time, Defendant failed to provide other reasonable accommodations.

223. Defendant did not offer Plaintiff a change of supervisor, despite the fact that Plaintiff's supervisor's spouse had sent racist death threats to Plaintiff.

224. Defendant did not offer Plaintiff a department transfer.

225. Defendant did not provide any accommodation to separate Plaintiff from his supervisor, Charlene Jolly.

226. Defendant did not provide any accommodation to ensure Plaintiff's safety at work.

227. A change of supervisor or department transfer would have been reasonable accommodations that would have allowed Plaintiff to continue working.

228. The failure to provide reasonable accommodations resulted in an adverse employment action.

229. Defendant's failure to provide reasonable accommodations beyond the part-time hours resulted in Plaintiff's constructive discharge on December 19, 2025.

230. Plaintiff was forced to resign because the working conditions remained intolerable despite the reduction in hours.

231. Plaintiff repeatedly sought meaningful accommodations beyond reduced hours, including requesting protection from continued exposure to his supervisor Charlene Jolly due to the ongoing safety concerns arising from her spouse's documented racist death threats. Despite these requests and the availability of alternatives, Defendant failed to offer a change of supervisor, department transfer, or any comparable separation that would have allowed Plaintiff to safely continue working.

232. As a direct and proximate result of Defendant's failure to provide reasonable accommodations, Plaintiff has suffered damages including lost wages, medical expenses, severe emotional distress, and other compensatory damages.

## Count VII - Negligence

### (against defendant Frye Regional Medical Center)

233. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 232 as if fully set forth herein.

234. Defendant owed a duty of care to Plaintiff.

235. As Plaintiff's employer, Defendant owed Plaintiff a duty to provide a safe working environment.

236. Defendant owed Plaintiff a duty to protect him from known threats to his safety.

237. Defendant owed Plaintiff a duty To enforce the no-contact order that Plaintiff provided to Defendant's HR department.

238. Defendant owed Plaintiff a duty to follow hospital policies regarding threats to staff members.

239. Defendant breached its duty of care to Plaintiff.

240. Defendant failed to enforce the no-contact order after Plaintiff reported it to HR manager Tim Hasson in January 2025.

241. Defendant failed to alert security to the threat against Plaintiff despite Plaintiff's reports and hospital policy requiring such alerts when staff members are threatened.

242. Defendant allowed the individual who threatened Plaintiff's life to schedule a procedure at the hospital despite the active no-contact order.

243. Defendant failed to provide Plaintiff with meaningful accommodations, such as a change of supervisor or department transfer.

244. Defendant aggressively refused Plaintiff's request to have a support person present at an HR meeting.

245. Defendant's breach of duty was the proximate cause of Plaintiff's injuries.

246. Defendant's failure to take corrective action directly caused Plaintiff to suffer severe anxiety, depression, and panic attacks.

247. Defendant's failure to enforce the no-contact order directly caused Plaintiff to encounter his harasser at the workplace.

248. Defendant's failure to provide a safe working environment directly caused Plaintiff's mental health to deteriorate.

249. Defendant's breach of duty directly caused Plaintiff to be forced to resign from his employment.

250. Plaintiff suffered damages.

251. Plaintiff suffered lost wages due to medical leave and his forced resignation.

252. Plaintiff incurred medical expenses for psychiatric medications and physician visits.

253. Plaintiff suffered severe emotional distress, including depression, anxiety, and panic attacks.

254. As a result of Defendant's conduct, Plaintiff required medical treatment and, on or about July 26, 2024, was evaluated by Amanda Kincaid, FNP, for symptoms of depression, anxiety, and panic. Plaintiff was prescribed medications including Adderall (used off label to address depression and fatigue) and propranolol (to treat anxiety and related cardiovascular symptoms).

255. As a direct and proximate result of Defendant's negligence, Plaintiff has suffered damages including lost wages, medical expenses, severe emotional distress, and other compensatory damages.

## Count VIII - Intentional Infliction of Emotional Distress

(against defendant Frye Regional Medical Center)

256. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 255 as if fully set forth herein.

257. Defendant's conduct was extreme and outrageous.

258. Defendant received reports of racist death threats directed at Plaintiff in June 2024 and January 2025.

259. Defendant obtained knowledge of a no-contact order against Plaintiff's harasser in January 2025.

260. Despite this knowledge, Defendant failed to enforce the no-contact order or alert security.

261. Defendant allowed the individual who threatened to kill Plaintiff to schedule a procedure at the hospital despite the active no-contact order.

262. Defendant forced Plaintiff to work in the same department as his harasser.

263. Defendant forced Plaintiff to encounter his harasser in the workplace hallway.

264. Defendant's supervisor suggested that Plaintiff take unpaid time off to avoid his harasser rather than protecting Plaintiff.

265. Defendant aggressively refused Plaintiff's request to have a support person present at an HR meeting after Plaintiff had reported feeling unsafe.

266. Defendant offered no meaningful accommodations despite Plaintiff's documented mental health crisis requiring multiple psychiatric medications and extended medical leave.

267. Defendant provided immediate alerts to security and staff when a different individual threatened staff in the emergency room but did not provide similar protection to Plaintiff.

268. Defendant's conduct exceeded all bounds of decency tolerated by society.

269. Defendant's deliberate indifference to racist death threats against an employee is atrocious and utterly intolerable in a civilized community.

270. Defendant acted with intent to cause severe emotional distress or with reckless disregard for the likelihood of causing severe emotional distress.

271. Defendant knew that Plaintiff had received racist death threats and was in fear for his life.

272. Defendant knew that Plaintiff's mental health was deteriorating, as evidenced by his medical leave and requests for accommodations.

273. Despite this knowledge, Defendant deliberately chose not to enforce the no-contact order or protect Plaintiff.

274. Defendant's actions demonstrated reckless disregard for the likelihood that they would cause Plaintiff severe emotional distress.

275. Plaintiff suffered severe emotional distress.

276. Plaintiff suffered depression, anxiety, and panic attacks requiring multiple psychiatric medications.

277. Plaintiff required extended medical leave from September through December 2025.

278. Plaintiff's mental health deteriorated to the point where he could barely leave his house.

279. Plaintiff was forced to resign from his employment due to the severity of his emotional distress.

280. Defendant's conduct was the proximate cause of Plaintiff's severe emotional distress.

281. Plaintiff's emotional distress was directly caused by Defendant's failure to protect him from known threats.

282. Plaintiff's emotional distress was directly caused by Defendant's deliberate indifference to his safety.

283. Plaintiff's emotional and mental health continued to deteriorate, as evidenced by his medical visit on or about November 5, 2025, with Amanda Kincaid, FNP. At that time, Plaintiff was diagnosed with a severe episode of major depressive disorder without psychotic features, sleep disturbance, panic attacks, abnormal laboratory findings, vitamin B12 and vitamin D deficiencies, and hypertension. In response to the severity of his condition, Plaintiff's medication regimen was adjusted to include bupropion, a prescription antidepressant used to treat major depressive disorder.

284. As a direct and proximate result of Defendant's intentional infliction of emotional distress, Plaintiff has suffered damages including medical expenses, severe emotional distress, lost wages, and other compensatory damages.

## Count IX - Negligent Infliction of Emotional Distress

(against defendant Frye Regional Medical Center)

285. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 284 as if fully set forth herein.

286. Defendant negligently engaged in conduct.

287. Defendant negligently failed to enforce the no-contact order after Plaintiff provided it to HR manager Tim Hasson.

288. Defendant negligently failed to alert security to the threat against Plaintiff despite hospital policy requiring such alerts.

289. Defendant negligently allowed Plaintiff's harasser to schedule a procedure at the hospital despite the active no-contact order.

290. Defendant negligently failed to provide meaningful accommodations to address Plaintiff's safety concerns and mental health needs.

291. It was reasonably foreseeable that Defendant's conduct would cause Plaintiff severe emotional distress.

292. Defendant knew that Plaintiff had received racist death threats and was in fear for his life.

293. Defendant knew that Plaintiff had obtained a no-contact order against his harasser.

294. Defendant knew that Plaintiff's mental health was deteriorating due to the threats and work situation.

295. It was reasonably foreseeable that failing to enforce the no-contact order would cause Plaintiff severe emotional distress.

296. It was reasonably foreseeable that allowing Plaintiff's harasser to come to the hospital would cause Plaintiff severe emotional distress.

297. It was reasonably foreseeable that forcing Plaintiff to work under the supervisor whose spouse had threatened him would cause Plaintiff severe emotional distress.

298. Defendant's conduct did in fact cause Plaintiff severe emotional distress.

299. Plaintiff suffered depression, anxiety, and panic attacks requiring multiple psychiatric medications.

300. Plaintiff required extended medical leave from September through December 2025.

301. Plaintiff's mental health deteriorated to the point where he could barely leave his house.

302. Plaintiff was forced to resign from his employment due to the severity of his emotional distress.

303. As a direct and proximate result of Defendant's negligent infliction of emotional distress, Plaintiff has suffered damages including medical expenses, severe emotional distress, lost wages, and other compensatory damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant as follows:

1. Compensatory damages against Defendant Frye Regional Medical Center for lost wages, including back pay from the date of Plaintiff's constructive discharge through the present, and future lost earnings.

2. Compensatory damages against Defendant Frye Regional Medical Center for medical expenses incurred for psychiatric treatment, medications, and physician visits.

3. Compensatory damages against Defendant Frye Regional Medical Center for severe emotional distress, pain and suffering, and mental anguish.

4. Front pay against Defendant Frye Regional Medical Center if reinstatement is not feasible.

5. Punitive damages against Defendant Frye Regional Medical Center to punish Defendant's willful, wanton, and reckless conduct and to deter similar conduct in the future.

6. Injunctive relief requiring Defendant Frye Regional Medical Center to implement policies and procedures to prevent similar discrimination, harassment, and retaliation in the future.

7. Reasonable attorney's fees and costs pursuant to 42 USCS § 2000e-5, 42 USCS § 1988 and applicable law.

8. Pre-judgment and post-judgment interest as allowed by law.

9. Such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/Amina M. Mack, Esq.
Amina M. Mack (NCSB No. 61390)
THE MACK LAW FIRM, PLLC
4242 Six Forks Road, Ste. 1550
Raleigh, NC 27609
Tel: 984-480-7147
legal@themacklaw.com

Attorney for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney for Plaintiffs, Steven Freeman Jr, hereby certifies that a copy of the foregoing Complaint was served on the Defendant via first-class U.S. mail delivery, return receipt requested, to the addresses listed below:

This the 20th day of April, 2026.

/s/ Amina M. Mack
Amina M. Mack, Esq.
NCSB: 61390
The Mack Law Firm, PLLC
4242 Six Forks Rd, Ste. 1550
Raleigh, NC 27609
984-480-7147
legal@themacklaw.com

**SERVED:**

**Frye Regional Medical Center, Inc.**
Registered Office address:
160 Mine Lake Ct., Suite 200
Raleigh, NC 27615-6417